FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF TEXAS
APR 11 2013
DAVID J. MALAND, CLERK
BY
DEPUTY ______

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

UNITED STATES OF AMERICA §
§
v. § NO. 4:13CR 93
§ Judge Schell
STEPHEN KING (1) §
EUNEISHA HEARNS (2) §

**INDICTMENT**

THE UNITED STATES GRAND JURY CHARGES:

**Count One**

Violation: 18 U.S.C. § 1956(h)
(Conspiracy to Commit Money Laundering in violation of 18 U.S.C. § 1956(a)(1)(B)(i)

**A. Introduction**

At all times material to this Indictment:

1. The defendant, **Stephen King** ("**King**"), was a real estate agent.

2. The defendant, **Euneisha Hearns** ("**Hearns**"), worked for a mortgage company as a loan officer.

3. Regency Title Company ("RTC") was a business that closed real estate purchase loans. RTC was located in Collin County, in the Eastern District of Texas.

4. YG, a person known to the Grand Jury, was an escrow officer who worked for RTC closing loans.

5. KM was a person known to the Grand Jury.

6. KB Group was a business entity controlled by KM. KM maintained a bank account at Bank of America in the name of KB Group ("KB Group Account").

7. The "Brownstone Property" was a residence located at 4005 Brownstone Court, Dallas, Texas.

8. The "Brook Meadow Property #1" was a residence located at 1456-1458 Brook Meadow Circle, Lancaster, Texas.

9. The "Brook Meadow Property #2" was a residence located at 1457-1459 Brook Meadow Circle, Lancaster, Texas.

10. GP was an individual, known to the Grand Jury, who owned Brook Meadow #1 and #2 Properties.

11. The Buyers, who were husband and wife, were persons known to the Grand Jury.

12. Wachovia Mortgage and Provident Home Loans were residential mortgage lenders.

13. A HUD-1 Settlement Statement ("Settlement Statement") was a document, prepared by a title company and executed by a buyer and seller of real estate at a loan closing, which reflected all sums received from and disbursed to the borrower, the seller, and the mortgage loan company. The Settlement Statement was a document that home mortgage lenders relied on to determine the source of all funds received by the title company and whether the funds they had loaned had been properly disbursed.

14. It was material to residential mortgage lenders, when determining whether to make a real estate purchase mortgage loan:

a. That the borrowers had the financial ability to pay their down payment on a residence from their own funds and not with funds provided by the seller.

b. That the loan application and supporting documents reflect the true purchase price for the property in that the mortgage lenders did not want to loan more than what the seller required to purchase the property.

c. That the source of all funds paid at closing and all fees or payments that would be made out of the loan proceeds be fully disclosed to the mortgage lender in the Settlement Statement.

d. The amount of a borrower's liabilities and debts.

## B. The Conspiracy

15. From on or about April 4, 2008, through on or about April 30, 2008, in the Eastern District of Texas, **King** and **Hearns** knowingly combined, conspired, and agreed together and with KM, YG, and others known and unknown to the Grand Jury, to conduct a financial transaction knowing that the property involved in the financial transaction represented the proceeds of some form of unlawful activity, which property was in fact the proceeds of specified unlawful activity, specifically Wire Fraud, a violation of 18 U.S.C. § 1343, knowing that the transaction was designed to conceal and

disguise the nature, location, source, ownership, and control of the proceeds of the specified unlawful activity, a violation of 18 U.S.C. § 1956(a)(1)(B)(i).

**C. The Manner and Means of the Conspiracy**

It was a part of the conspiracy that:

16. **Brownstone Property**

a. On or about April 4, 2008, **King**, who was assisting the Buyers in purchasing the Brownstone Property, referred the Buyers to **Hearns** to obtain a mortgage loan to purchase the property. **King** knew the Buyers did not have sufficient funds to make a down payment for the loan and that **Hearns** would make materially false statements on the loan application in order to obtain the loan.

b. On or about April 4, 2008, **Hearns** prepared and submitted an application to Wachovia Mortgage, on behalf of the Buyers, requesting a loan totaling $323,200 to purchase the Brownstone Property. **Hearns** knowingly caused the loan application to be materially false in that she reflected that the Buyers had $102,677 in a bank account and that the buyer's down payment of approximately $83,787.02 would be paid from the Buyers' funds held in their bank account. **Hearns** and **King** knew this statement was false and they knew the Buyers did not have that amount of money in a bank account, and that the Buyers did not have sufficient savings to make a down payment in that amount. **King** knew the Buyers' down payment would be made from the proceeds of the loan.

c. On or about April 4, 2008, the sale of the Brownstone Property was closed at RTC. YG caused the Settlement Statement to falsely reflect that the Buyers were the source of the $88,698.97 down payment, when, as she knew, the Buyers were not the source of the down payment funds, and that some of the loan proceeds would be the actual source of the funds for the down payment.

d. On or about April 4, 2008, the actions of **King**, **Hearns**, KM, and YG caused Wachovia Bank to transfer $315,868.51 by wire from an account in the state of North Carolina to the RTC Bank account in Texas to fund the loan to the Buyers to purchase the Brownstone Property ("Brownstone Property Loan").

e. On or about April 7, 2008, KM transferred $88,698.97 by wire from her bank account in Oklahoma to a bank account in Texas, controlled by **King**, for the purpose of paying the Buyers' down payment.

f. On or about April 8, 2008, **King** used the funds he received from KM to purchase a cashier's check in the amount of $85,673.00, reflecting one of the Buyers as the remitter of the check, and the check was tendered to RTC for the Buyers' down payment.

g. On or about April 8, 2008, YG transferred $97,608.87 of the seller's proceeds from the sale by wire to the KB Group Account. In order to conceal the true nature of the payment from the lender and the fact it was going to KM to repay her for the down payment funds, YG caused the Settlement Statement to not reflect the payment to the KB Account.

17. **<u>Brook Meadow Property #1</u>**

a. On or about April 17, 2008, **King**, who was assisting the Buyers in purchasing the Brook Meadow Property #1, referred the Buyers to **Hearns** to obtain a mortgage loan to purchase the property. **King** knew the Buyers did not have sufficient funds to make a down payment for the loan and that **Hearns** would make materially false statements on the loan application in order to obtain the loan.

b. On or about April 17, 2008, **Hearns** prepared and submitted an application to Provident Home Loans, on behalf of the Buyers, requesting a loan totaling $128,000 to purchase the Brook Meadow Property #1. **Hearns** knowingly caused the loan application to be materially false in that she reflected that the Buyers had $101,774.84 in a bank account and that the buyer's down payment of approximately $38,023.92 would be paid from the Buyers' funds held in their checking account. **Hearns** and **King** knew this statement was false and they knew the Buyers did not have that amount of money in a bank account and that the Buyers did not have sufficient savings to make a down payment in that amount. **King** knew the down payment funds would not be provided by the Buyer and that the funds would come from the loan proceeds. **Hearns** also knowingly made a material omission on the loan application that did not reflect the existence of the Brownstone Property Loan when disclosure of such a liability was required.

c. On or about April 17, 2008, the sale of the Brook Meadow Property #1 was closed at RTC. YG caused the Settlement Statement to falsely reflect that the

Buyers were the source of the $35,582.85 down payment, when, as she knew, the Buyers were not the source of the down payment funds, and that the seller proceeds would be the actual source of the funds for the down payment.

d. On or about April 17, 2008, the actions of **King**, **Hearns**, KM, and YG caused Provident Home Loans to transfer $126,092.46 by wire from an account in the state of Minnesota to the RTC Bank account in Texas to fund the loan to the Buyers to purchase the Brook Meadow Circle Property #1 ("Brook Meadow Property #1 Loan").

e. On or about April 16, 2008, KM transferred $37,000 by wire from her bank account in Oklahoma to a bank account in Texas, controlled by **King**, for the purpose of paying the Buyers' down payment.

f. On or about April 17, 2008, **King** used the funds he received from KM to purchase a cashier's check in the amount of $35,582.85, reflecting one of the Buyers as the remitter of the check, and the check was tendered to RTC for the Buyers' down payment.

g. On or about April 17, 2008, YG transferred $40,850 of the seller's proceeds from the sale by wire to the KB Group Account. In order to conceal and disguise the true nature of the payment from the lender and the fact it was going to KM to repay her for the down payment funds, YG caused the Settlement Statement to only reflect that the funds had been disbursed to Bank of America.

18. **Brook Meadow Property #2**

a. On or about April 29, 2008, **King**, who was assisting the Buyers in purchasing the Brook Meadow Property #2, referred the Buyers to **Hearns** to obtain a mortgage loan to purchase the property. **King** knew the Buyers did not have sufficient funds to make a down payment for the loan and that **Hearns** would make materially false statements on the loan application in order to obtain the loan.

b. On or about April 29, 2008, **Hearns** prepared and submitted an application to Provident Home Loans, on behalf of the Buyers, requesting a loan totaling $120,000 to purchase the Brook Meadow Property #2. **Hearns** knowingly caused the loan application to be materially false in that she reflected that the Buyers had $101,774.84 in a bank account and that the buyer's down payment of approximately $37,107.39 would be paid from the Buyers' funds held in their checking account. **Hearns** and **King** knew this statement was false, and they knew the Buyers did not have that amount of money in a bank account and that the Buyers did not have sufficient savings to make a down payment in that amount. **King** knew the down payment funds would not be provided by the Buyers and the funds would come from the loan proceeds. **Hearns** also knowingly omitted the existence of the Brownstone Property Loan, a liability for the Buyers, even though she knew the liability existed and should be disclosed.

c. On or about April 29, 2008, the sale of Brook Meadow Property #2 was closed at RTC. YG caused the Settlement Statement to falsely reflect that the Buyers

were the source of the $33,582.36 down payment, when, as she knew, the Buyers would not be the source of the down payment funds and that the seller proceeds would be the actual source of the funds for the down payment.

d. On or about April 29, 2008, the actions of **King**, **Hearns**, KM, and YG caused Provident Home Loans to transfer $118,272.66 by wire from an account in the state of Minnesota to the RTC Bank account in Texas to fund the loan to the Buyers to purchase the Brook Meadow Property #2.

e. On or about April 29, 2008, KM transferred $35,500 by wire from her bank account in Oklahoma to a bank account for RTC, for the purpose of paying the Buyers' down payment.

f. On or about April 29, 2008, YG used the funds sent by KM to RTC to pay the Buyers' down payment for the Brook Meadow Property #2, knowing that these funds were not provided by the Buyers and that the funds would be paid back to KM from the seller's proceeds.

g. On or about April 29, 2008, YG transferred $39,134 of the seller's proceeds from the sale by wire to the KB Group Account. In order to conceal and disguise the true nature of the payment from the lender and the fact that it was going to KM to repay her for the down payment funds, YG caused the Settlement Statement to only reflect that the funds had been disbursed to Bank of America.

19. On or about the following dates, in the Eastern District of Texas, as representative of the conspiracy, the following conspirators caused the following actions:

**Brownstone Property**

a. On or about April 4, 2008, **King**, **Hearns**, and YG caused the purchase loan for the Brownstone Property to close at RTC.

**Brook Meadow Property #1**

b. On or about April 17, 2008, **King**, **Hearns**, and YG caused the purchase loan for the Brook Meadow Property #1 to close at RTC.

**Brook Meadow Property #2**

c. On or about April 29, 2008, **King**, **Hearns**, and YG caused the purchase loan for the Brook Meadow Property #2 to close at RTC.

In violation of 18 U.S.C. § 1956(h).

## NOTICE OF INTENT TO SEEK CRIMINAL FORFEITURE

Pursuant to 18 U.S.C. § 982(a)(1) and 28 U.S.C. § 2461

As the result of committing the offense alleged in this Indictment, the defendants shall forfeit to the United States:

1. any property constituting, or derived from, and proceeds the defendants obtained, directly or indirectly, as the result of such violation; and

2. any of the defendants' property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, such violation, including but not limited to the following:

**Property Belonging to Stephen King**

Approximately $23,747.79 in United States currency and all interest and proceeds traceable thereto, in that such sum in aggregate is property constituting, or derived from, proceeds obtained directly or indirectly, as the result of the offenses alleged in this Indictment.

**Property Belonging to Euneisha Hearns**

Approximately $11,781.00 in United States currency and all interest and proceeds traceable thereto, in that such sum in aggregate is property constituting, or derived from, proceeds obtained directly or indirectly, as the result of the offenses alleged in this Indictment.

**Substitute Assets**

If any of the property described above as being subject to forfeiture, as a result of any act or omission of the defendants -

(a) cannot be located upon the exercise of due diligence;

(b) has been transferred or sold to, or deposited with a third person;

(c) has been placed beyond the jurisdiction of the court;

(d) has been substantially diminished in value; or

(e) has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to 21 U.S.C. § 853(p), to seek forfeiture of any other property of the defendants up to the value of the above forfeitable property, including but not limited to all property, both real and personal owned by the defendants.

By virtue of the commission of the offenses alleged in this Indictment, any and all interest the defendants has in the above-described property is vested in and forfeited to the United States.

A TRUE BILL

BB
GRAND JURY FOREPERSON

JOHN M. BALES
UNITED STATES ATTORNEY

J. ANDREW WILLIAMS
Assistant United States Attorney
Oklahoma Bar No. 009650
101 East Park Boulevard, Suite 500
Plano, Texas 75074
Telephone: (972) 509-1201
Fax: (972) 509-1213
andy.williams@usdoj.gov

4-10-2013
Date

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| v. | § | NO. 4:13CR |
| | § | Judge |
| STEPHEN KING (1) | § | |
| EUNEISHA HEARNS (2) | § | |

**NOTICE OF PENALTY**

**Counts One**

Violation: 18 U.S.C. § 1956(h)
(Conspiracy to Commit Money Laundering in violation of 18 U.S.C. § 1956(a)(1)(B)(i)

Penalty: A fine of not more than $500,000, and/or imprisonment for not more than 20 years, and a Term of Supervised Release for not more than 3 years.

Special Assessment: $100.00